IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK BURGESS                          §
                                      §
v.                                    §          C.A. NO. C-10-371
                                      §
MICHAEL J. ASTRUE                     §

**MEMORANDUM AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Mark Burgess brought this action on November 22, 2010, seeking

review of the Commissioner's final decision that he is not disabled and, therefore,

not entitled to supplemental security income or disability insurance benefits.  (D.E.

1).  On February 18, 2011, Defendant filed a motion[1] for summary judgment, (D.E.

7), with a brief in support.  (D.E. 8).  Plaintiff filed a cross-motion[2] for summary

judgment on March 15, 2011.  (D.E. 11).  On March 28, 2011, Defendant filed a

response to Plaintiff's motion for summary judgment.  (D.E. 12).  Plaintiff filed a

response to Defendant's motion for summary judgment on April 1, 2011, (D.E.

13), asserting that Defendant's arguments were adequately addressed in his cross-

motion for summary judgment.  (D.E. 11).  For the reasons stated herein, it is

respectfully recommended that Plaintiff's cross-motion for summary judgment be

granted in part and denied in part, Defendant's motion for summary judgment be

---

[1] Defendant actually entitles his motion as a "cross-motion" even though it is the first motion seeking summary judgment relief.

[2] Plaintiff actually entitles this motion as a "brief in support of the original complaint."

granted in part and denied in part, and the action remanded for further proceedings.

# I. JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

# II. BACKGROUND

On March 14, 2008, at the age of forty-nine, Plaintiff filed a claim with the Social Security Administration for disability insurance benefits and supplemental security income.  Tr. 134-42.  In both, he alleged a disability period beginning December 17, 2000.  Tr. 139.  The claims were denied on July 21, 2008.  Tr. 69-78.  Plaintiff appealed, and his appeal was denied on September 23, 2008.  Tr. 84-91.  He requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 16, 2009.  Tr. 7-50.  On August 4, 2009, the ALJ issued a decision denying Plaintiff supplemental security income or disability benefits.  Tr. 58-67.  The Social Security Administration denied Plaintiff's request to review the ALJ's decision, and on November 22, 2010 he filed this action.  (D.E. 1).

## A.    Plaintiff's Medical Records.

Plaintiff's alleged impairments consist of pain in his back, neck, and extremities, as well as hypertension, hepatitis C, cirrhosis, hearing impairment, vertigo, and various mental problems, including post-traumatic stress disorder

("PTSD"),[3] anxiety, and depression.

**1.    Plaintiff's back and neck problems.**

Plaintiff had surgery on the C6-C7 vertebrae in 1999 for an injury he sustained during a car crash in the early 1990s.  Tr. 345.  On December 13, 2000, he was working as a carpenter at a Texas state prison when several inmates struck him at the base of the skull with an ax-handle, tied his hands behind his back, and stabbed him repeatedly in his extremities with a knife.  Tr. 29-30, 343.  Plaintiff reported for work the following day, but began to experience back pain.  Id.

On April 3, 2001, Dr. Bruce McFarland noted that Plaintiff had a history of cervical fusion status.  Tr. 191.  Dr. Charles Breckenridge observed on April 3, 2001 that he was taking Tylenol 3 for his pain.  Tr. 248.  On July 31, 2001, Dr. Charles Strauss found Plaintiff's spine normal.  Tr. 294.  Dr. Breckenridge recommended on August 28, 2001 that he receive epidural steroid injections for his spine problems and the resulting pain.  Tr. 242.  On October 9, 2001, he found that Plaintiff had cervical strain and advised further pain management.  Tr. 238-39.  Dr. Breckenridge reiterated that finding and recommendation on November 6, 2001,

---

[3] Post-traumatic stress disorder "is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity.... The characteristic symptoms ... include persistent reexperiencing of the traumatic event ... persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness ... and persistent symptoms of increased arousal."  Diagnostic and Statistical Manual of Mental Disorders 463 (4th ed. 2000) [hereinafter DSM].

further concluding that Plaintiff was "disabled from his usual and customary work." Tr. 237-38.

On January 11, 2002, Dr. Alex Willingham examined Plaintiff and found an MRI of his lumbar spine normal.  Tr. 434.  He reported that Plaintiff had previously taken Ultram[4] for pain treatment.  Id.  Dr. Willingham determined that he had lower back pain but that there was no evidence of radiculopathy,[5] and suggested an epidural steroid injection.  Tr. 435.

On January 15, 2002, Dr. Breckenridge again found Plaintiff to suffer cervical strain, and again advised pain management and epidural steroid injections. Tr. 235-36.  Dr. Uma Gullapalli examined x-rays of Plaintiff on April 3, 2002, concluding that his C-Spine had not been fractured and ruling out cervical radiculopathy.  Tr. 198-200.  On April 17, 2002, Dr. Charles Syms noted that Plaintiff was taking Vicodin.[6]  Tr. 222.

On October 23, 2002, Dr. Ellen Duncan gave Plaintiff a lumbar facet injection to ameliorate his back pain, a lumbar epidural steroid injection to treat his

---

[4] Ultram is a "trademark for a preparation of tramadol hydrochloride."  Dorland's Illustrated Medical Dictionary 1909 (29th ed. 2000) [hereinafter Dorland's].  Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain."  Id. at 1862.

[5] Radiculopathy is a "disease of the nerve roots ... often manifesting as neck or shoulder pain."  Dorland's, at 1511.

[6] Vicodin is the brand name for hydrocodone bitartrate.  See http://www.rxlist.com/vicodin-drug.htm (last visited Apr. 5, 2011).  Hydrocodone bitartrate is "a semisynthetic derivative of codeine used as an antitussive."  Dorland's, at 840.

lumbar radiculitis, and a sacroiliac joint injection to treat his pain in that area.  Tr. 275-76.  She reported that he recovered uneventfully.  Tr. 275-77.  Dr. Duncan noted that Plaintiff suffered from degenerative disc disease that may have been exacerbated by the attack he suffered during the escape attempt.  Tr. 278.

On November 19, 2002, Dr. Breckenridge again found Plaintiff to have cervical strain.  Tr. 233.  Joseph Eubanks, a Ph.D. in psychology, noted on June 25, 2002 that Plaintiff was taking hydrocodone.  Tr. 225.  On November 20, 2002, Dr. Duncan noted that Plaintiff suffered from "classic ... radicular type symptoms."  Tr. 274.  That day, she provided Plaintiff a lumbar epidural steroid injection, sacroiliac join injection, and trigger point injection, and reported no complications following the operation.  Tr. 272.

On August 15, 2003, Plaintiff underwent a lumbar epidural steroid and left-sided sacroiliac joint injection for his lumbar radiculitis and sacroiliac pain and dysfunction.  Tr. 269-70.  The surgeon, Dr. Duncan, reported that he recovered uneventfully.  Tr. 270.

On April 9, 2004, Dr. Brendan O'Connor found Plaintiff's spine normal.  Tr. 291.  He determined that his discs and vertebrae were normal on April 10, 2004.  Tr. 292.  On November 24, 2004, Louise Beardsley, a caseworker employed by the State of Texas, reported that Plaintiff was taking Celebrex[7] for pain.  Tr. 298.  She

---

[7] Celebrex is a "trademark for a preparation of celecoxib."  Dorland's, at 305.  Celecoxib is "a nonsteroidal antiinflammatory drug ... used for the symptomatic treatment of osteoarthritis

noted that Plaintiff's "problems stemming from the injury [sustained during the prison escape were] not resolved." Tr. 298.

On May 12, 2005, Dr. Eradio Arredondo, an orthopaedic surgeon, diagnosed Plaintiff with non-specific lower back pain. Tr. 347. He nevertheless remarked that Plaintiff did not require the dosage of Vicodin that he was currently taking–or any other narcotic–as he did not suffer from any serious pathology and could be successfully treated for his back pain with an over-the-counter drug. Tr. 348. On May 16, 2005, Dr. Arredondo noted that Plaintiff was capable of performing medium work, albeit not able to return to his previous position at the prison. Tr. 332. He believed Plaintiff could drive to and from work, while avoiding any heights, climbing, or physical restraining, and that a desk job was within his abilities. Id. That same day, Dr. Arredondo also received a functional capacity evaluation, which noted that Plaintiff had "demonstrated a somewhat unreliable effort throughout testing" and therefore that the study might underestimate his true working capacity. Tr. 334. He summarized this evaluation as establishing that Plaintiff could occasionally lift twenty-one to fifty pounds, frequently lift eleven to twenty-five, and constantly lift one to ten pounds. Id.

On November 28, 2006, Dr. Arthur Chin prescribed Plaintiff Skelaxin.[8] Tr.

---

and rheumatoid arthritis." Id.

[8] Skelaxin is a "trademark for a preparation of metaxalone." Dorland's, at 1651. Metaxalone is "a smooth muscle relaxant used in the treatment of painful musculoskeletal

6

361.  Dr. John Davis assessed Plaintiff as suffering from chronic pain syndrome on August 21, 2007, and reiterated that conclusion on September 12, 2007 and December 19, 2007.  Tr. 438, 442, 443.

### 2.    Plaintiff's arm and hand problems.

On April 3, 2001, Dr. McFarland determined that Plaintiff suffered from moderate carpal tunnel syndrome.  Tr. 193.  Dr. Paul Lifland reported three days later that carpal tunnel release and anterior transposition might ameliorate the effects of his carpal tunnel syndrome, but that "there would be no guarantee that he would have a 100% recovery" given the progression of the conditions.  Tr. 328. On May 17, 2001, Dr. Lifland performed those operations and reported afterwards that Plaintiff recovered well.  Tr. 295.  He nevertheless noted under post-operative diagnoses that Plaintiff still had carpal tunnel syndrome and ulnar neuropathy.  Tr. 296.  Dr. Lifland commented on May 30, 2001 that Plaintiff was recovering as expected, but was "unable to work at this time."  Tr. 326.

On June 19, 2001, Dr. Breckenridge noted that Plaintiff had status post left hand carpal tunnel release with continued pain.  Tr. 249.  The next day, Darryl Martin, a physical therapist, recommended that Plaintiff undergo rehabilitative therapy to provide pain relief, improve his range of motion, and develop his muscle function.  Tr. 247.  He suggested a regimen of three sessions a week for four

conditions."  Id. at 1097.

7

weeks.  Id.  On July 30, 2001, Gino Chincarini, another physical therapist, noted that Plaintiff was "progressing toward all goals" and recommended that he continue therapy for three weeks.  Tr. 245.

On July 31 and August 28, 2001, Dr. Breckenridge diagnosed Plaintiff with status post left hand carpal tunnel release with continued pain.  Tr. 241, 243.  He performed right elbow anterior ulnar nerve transposition with fascial sling and neurolysis on September 9, 2001.  Tr. 194-96, 199.  On October 9, 2001, Dr. Breckenridge found that Plaintiff still had status post left hand carpal tunnel release with continued pain and mildly restricted motion in his right elbow.  Tr. 239.  He reiterated that he had status post left hand carpal tunnel release with continued pain on November 6, 2001, but determined that he now had full extension of the elbow and that his grip strength was slowly improving.  Tr. 237.

On January 11, 2002, Dr. Willingham examined Plaintiff and determined that he suffered from status post bilateral carpal tunnel release and ulnar nerve transposition.  Tr. 435.  Dr. Breckenridge affirmed on January 15, 2002 that he continued to suffer from status post left hand carpal tunnel release with continued pain.  Tr. 235.  On November 19, 2002, he again noted carpal tunnel release with continued pain, and found Plaintiff's elbows to have full extension as well as weak grip strength.  Tr. 232.

On May 12, 2005, Dr. Arredondo found that Plaintiff had normal range of

motion for his elbow.  Tr. 347.  He diagnosed him with left carpal tunnel syndrome and status post release ulnar nerve, but indicated that he did not require care for the conditions.  Tr. 347-48.  On June 12, 2008, Dr. O. Martin Franklin diagnosed Plaintiff with carpal tunnel syndrome and ulnar tunnel syndrome.  Tr. 463.  Dr. Patty Rowley concurred in this diagnosis on July 16, 2008.  Tr. 482.

### 3.    Plaintiff's leg problems.

In the early 1990s, Plaintiff had arthroscopic surgery on his right knee as the result of a skating accident.  Tr. 191, 345.  On October 9, 2001, Dr. Breckenridge found that straight leg raising did not cause neurological compromise.  Tr. 239.  He found that Plaintiff could not raise his leg straight without pain on November 6, 2001.  Tr. 237.  On January 15, 2002, Dr. Breckenridge noted that raising Plaintiff's legs straight caused him discomfort in the spine.  Tr. 235.  However, Dr. Arredondo found on May 12, 2005 that Plaintiff had no motor or sensory loss in his lower extremities, and that the reflexes of his knees and ankles were normal. Tr. 347.

### 4.    Plaintiff's hypertension.

On April 3, 2001, Dr. McFarland noted that Plaintiff had a history of hypertension.  Tr. 191.  Dr. Breckenridge reported on June 19, 2001 that he was taking Prinivil.[9]  Tr. 248.  On January 11, 2002, Dr. Willingham examined Plaintiff

---

[9] Prinivil is a "trademark for a preparation of lisinopril."  Dorland's, at 1456.  Lisinopril is "an angiotensin-converting enzyme inhibitor used in the treatment of hypertension, congestive

and found his blood pressure to be 144/98, which he thought indicated hypertension.  Tr. 434-35.

On April 3, 2002, Dr. Gullapalli also noted a history of hypertension.  Tr. 200.  On April 17, 2002, Dr. Syms assessed Plaintiff's blood pressure at 138/98 and likewise mentioned a significant history of hypertension.  Tr. 222.  He recorded Plaintiff's blood pressure at 118/70 on May 17, 2002 and prescribed him Maxzide.[10]  Tr. 201.  On June 25, 2002, Dr. Eubanks noted that Plaintiff was taking Lotrel.[11]  Tr. 225.  Ms. Beardsley reported on November 24, 2004 that Plaintiff was taking Diovan[12] for high blood pressure.  Tr. 298.

On August 21, 2007, Dr. Davis assessed Plaintiff as suffering from benign hypertension.  Tr. 443.  He confirmed that diagnosis on December 19, 2007, February 4, 2009, and March 4, 2009.  Tr. 438, 498, 513.

---

heart failure, and acute myocardial infarction."  Id. at 1019.

[10] Maxzide is a brand name for hydrochlorothiazide.  See http://www.medicinenet.com/triamterene_and_hydrochlorothiazide/article.htm (last visited April 5, 2011).  Hydrochlorothiazide is "a thiazide diuretic, used for treatment of hypertension and edema."  Dorland's, at 840.

[11] Lotrel is a "trademark for a preparation of amlodipine besylate combined with benazepril hydrochloride."  Dorland's, at 1028.  Amlodipine besylate is "a calcium-channel blocker used in the treatment of hypertension and chronic stable and vasospastic angina."  Id. at 63.

[12] Diovan is a brand name for valsartan.  See http://www.rxlist.com/diovan-drug.htm (last visited April 5, 2011).  Valsartan is "an angiotensin II blocker used as an antihypertensive."  Dorland's, at 1929.

**5.      Plaintiff's liver problems.**

On May 17, 2002, Dr. Michael Bailey diagnosed Plaintiff with chronic hepatitis and cirrhosis.  Tr. 372.  Dr. Davis determined he was suffering from chronic hepatitis C on September 12, 2007.  Tr. 442.  On June 12, 2008, Dr. Franklin diagnosed Plaintiff with hepatitis C, but indicated that it was being treated successfully.  Tr. 464.

**6.      Plaintiff's hearing.**

On January 11, 2002, Dr. Willingham examined Plaintiff and found his hearing slightly diminished on the right side, where he suffered from tinnitus.[13]  Tr. 434-35.  Dr. Gullapalli noted that Plaintiff had difficulty hearing on his right side on April 3, 2002, though he ruled out hearing loss in his official assessment.  Tr. 200.  On April 17, 2002, Dr. Syms diagnosed Plaintiff with tinnitus and sensorineural hearing loss.  Tr. 221.  He diagnosed Plaintiff on May 17, 2002 with endolymphatic hydrops,[14] tinnitus, and sensorineural hearing loss.  Tr. 201.

On January 31, 2003, Dr. Diana Henderson examined Plaintiff on behalf of the Texas Workers' Compensation Commission ("TWCC") and diagnosed him with significant bilateral sensory neural hearing loss, tinnitus, and endolymphatic

---

[13] Tinnitus is "a noise in the ears, such as ringing, buzzing, roaring, or clicking." Dorland's, at 1843.

[14] Endolymph is "the fluid contained in the membranous labyrinth of the ear."  Dorland's, at 594.  Hydrops is "a condition in which [a] tube becomes closed, and the tube may reach enormous proportions as it fills with" liquid.  Id. at 843.

hydrops, suggesting that the condition was caused by trauma.  Tr. 252.  She warned

that his hearing problems might worsen over time.  Tr. 253.  On February 18, 2003,

the TWCC indicated that Plaintiff and his employer agreed that his hearing

problems did not constitute a compensable injury.  Tr. 288.  On January 23, 2008,

his hearing was evaluated by Jeffrey Sirianni, a clinical audiologist who

recommended that he begin using a hearing aid.  Tr. 445-46.  On June 12, 2008,

Dr. Franklin determined that Plaintiff suffered from bilateral tinnitus with hearing

loss.  Tr. 463.  Holly Foley, another audiologist, seconded the hearing aid

recommendation on June 17, 2008.  Tr. 449.

### 7.    Plaintiff's vertigo.

On April 17 and May 17, 2002, Dr. Syms diagnosed Plaintiff with dizziness

and vertigo, noting that he was taking meclizine[15] and prescribing him Phenergan.[16]

Tr. 201, 221.  On January 31, 2003, Dr. Henderson diagnosed Plaintiff with

vertigo.  Tr. 252.  She noted that he probably suffered from chronic disequilibrium

and should take medication, though drugs would probably not cure the condition.

Id.  Dr. Henderson postulated that the condition would likely worsen with time.

Tr. 253.  She recommended that Plaintiff "avoid any work that puts him in a

---

[15] Meclizine is "an antihistamine used as an antiemetic in the management of nausea, vomiting, and dizziness associated with motion sickness."  Dorland's, at 1069.

[16] Phenergan is a "trademark for preparations of promethazine hydrochloride."  Dorland's, at 1369.  Promethazine hydrochloride is "a phenothiazine derivative ... used to ... manage nausea and vomiting associated with ... motion sickness."  Id. at 1467.

situation with possible bodily injury due to his disequilibrium."  Tr. 253.

On February 18, 2003, the TWCC indicated that Plaintiff and his employer agreed that his vertigo was caused by the prisoner assault and constituted a compensable injury.  Tr. 288.  Ms. Beardsley reported on April 12, 2004 that Dr. Chin considered Plaintiff capable of performing "light duty work" for up to four hours daily.  Tr. 309.  On May 12, 2005, Dr. Arredondo diagnosed him as suffering from residual vertigo and suggested neurological treatment for the condition.  Tr. 347-48.  The same day, Dr. Franklin wrote that Plaintiff suffered from positional vertigo.  Tr. 463.  On July 16, 2008, Dr. Rowley determined that Plaintiff suffered from positional vertigo and should avoid unprotected heights and moving machinery.  Tr. 486.

### 8.    Plaintiff's mental problems.

On January 11, 2002, Dr. Willingham determined that Plaintiff suffered from PTSD, sleep disorder, and a mild brain injury.  Tr. 435.  Dr. Gullapalli described Plaintiff as suffering from PTSD on April 3, 2002.  Tr. 200.  On April 17, 2002, Dr. Syms noted a significant history of depression, anxiety, sleeping difficulty, disorientation, confusion, and concentration problems.  Tr. 222.  On July 16, 2008, Dr. Rowley diagnosed Plaintiff with PTSD.  Tr. 52.  Dr. Frederick Cremona reached the same diagnosis on September 18, 2008.  Tr. 53.

Dr. Eubanks noted on June 25, 2002 that Plaintiff had previously taken

13

Paxil[17] but was no longer on it.  Tr. 225.  He considered his self-reporting to

indicate mild to moderate depression and anxiety.  Tr. 226.  Dr. Eubanks placed

Plaintiff in category two of the Minnesota Multiphasic Personality Inventory,[18] and

considered that for such individuals "anxiety and depression are usually absent."

Tr. 227.  He also observed that Plaintiff was generally alert, and did not appear to

have any problems concentrating, remembering, problem-solving, or

communicating.  Tr. 227-28.  Dr. Eubanks further noted, however, that he

discerned "signs and symptoms of depression and anxiety as well as" PTSD.  Tr.

228.  Ultimately, however, he "ruled out" PTSD, though he diagnosed Plaintiff

with adjustment disorder, anxiety, and depressed mood.  Tr. 228.  Dr. Eubanks

recommended psychopharmacological management and therapy.  Tr. 227-28.

On October 21, 2002, James McMan, a psychologist with a Ph.D., examined

Plaintiff.  Tr. 265.  He found his communication skills good, but his testing

revealed mild depressive symptoms and consequent poor energy.  Tr. 266.  Dr.

McMan also found moderate levels of anxiety symptoms.  Id.  He diagnosed him

---

[17] Paxil is a "trademark for a preparation of paroxetine hydrochloride."  Dorland's, at 1339.  Paroxetine hydrochloride is "a selective serotonin reuptake inhibitor used in the treatment of depression."  Id. at 1325.

[18] This diagnostic test "is 'one of the best known and widely used personality assessment tests.'"  Rompilla v. Horn, 355 F.3d 233, 242 n.5 (3d Cir. 2004) (Alito, J.) (citation omitted), reversed on other grounds by Rompilla v. Beard, 545 U.S. 374 (2005).  It is used to "provide scores on all the more important personality traits and adaptations."  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1092 n.3 (9th Cir. 1999) (en banc) (citation omitted).

with chronic PTSD, one symptom of which he defined as persistent difficulty

concentrating.  Tr. 267-68.  Dr. McMan further diagnosed Plaintiff as an individual

unable to work as a result of being victimized by a severe physical assault.  Tr.

268.  He gave him a Global Assessment of Functioning ("GAF") score of sixty[19]

and recommended that Plaintiff undergo psychotherapy.  Id.

On March 3, 2003, Plaintiff was jointly examined by Mary Jane Schreiber, a

psychodiagnostician, and Sean Connolly, a psychologist with a Ph.D.  Tr. 259.

They noted that Plaintiff's college instructors believed him to be dyslexic, but

observed that his communication skills ranged from good to excellent, that his

abstract reasoning abilities and social judgment were satisfactory, and his

concentration and memory fair.  Tr. 254-56.  On the whole, Ms. Schreiber and Dr.

Connolly found him to be of average intelligence, giving him a full scale IQ score

of 107.  Tr. 256.  They considered his neuropsychological performance to "raise

questions about cerebral dysfunctioning" and characterized him as mildly

depressed.  Tr. 256-57.

Dr. Connolly and Ms. Schreiber diagnosed Plaintiff with "serious difficulties

in social and occupational functioning."  Tr. 258.  They concluded that he had

---

[19] The GAF scale takes into account psychological, social, and occupational capabilities
on a hypothetical spectrum of mental health.  An individual in the 51-60 range suffers
"[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning (e.g. no friends, unable to keep
a job)."  DSM, at 34 (4th ed. 2000).

"good cognitive ability for a variety of training and employment opportunities,"
but strongly recommended continued counseling.  Tr. 258-59.  The pair concluded
that he suffered from limitations in physical functioning, mild difficulties with
memory, and depression that affected motivation, but also considered him to
possess a number of vocational assets that would benefit him in the workplace.  Id.

On November 24, 2004, Ms. Beardsley reported that Plaintiff had an
Effexor[20] prescription to treat his depression.  Tr. 298.  Dr. Arredondo diagnosed
Plaintiff as suffering from PTSD on May 12, 2005 and commented that he should
continue taking Effexor.  Tr. 347-48.  On September 12, 2007, and again on
December 19, 2007, Dr. Davis assessed Plaintiff as suffering from anxiety and
depression.  Tr. 438, 442.

On June 11, 2008, Carol Clark, a Ph.D. in psychology, examined Plaintiff.
Tr. 454-57.  She found that he suffered from no mental impairments and had fair
judgment.  Tr. 456.  Dr. Clark diagnosed him with PTSD and recurrent, moderate,
chronic major depressive disorder.  Tr. 457.  She also noted that he had
psychosocial and environmental problems, as well as occupational, economic, and
social environmental problems.  Tr. 457.  Dr. Clark gave him a GAF score of fifty-
eight.  Id.  She recommended that he receive therapy for his PTSD but noted that

---

[20] Effexor is a "trademark for a preparation of venlafaxine hydrochloride."  Dorland's, at
570.  Venlafaxine hydrochloride is "an inhibitor of serotonin and norepinephrine reuptake,
unrelated chemically to any other antidepressants ... used as an antidepressant."  Id. at 1953.

she believed "the likelihood of his being able to be employed in the future is low." Id.

On July 16, 2008, Dr. Margaret Meyer found that Plaintiff suffered from moderate, recurrent, major depressive disorder. Tr. 471. She found him mildly limited in his restrictions of daily living and in his ability to maintain concentration, persistence, or pace, moderately limited in social functioning, and suffering from no episodes of decompensation. Tr. 478. In considering a fuller list of his mental capabilities, Dr. Meyer classified him as either moderately limited or not significantly limited with respect to every category. Tr. 490-91. She noted that he was able to dress, groom, and feed himself, as well as cook, perform chores, do yard work, drive, and handle finances. Tr. 480. She concluded that he was "somewhat limited by PTSD/MDD [major depressive disorder], but the impact does not wholly compromise [his] ability to function independently, appropriately, and effectively on a sustained basis." Id. She determined on March 4, 2009 that Plaintiff suffered from prolonged PTSD. Tr. 513.

**B.    Plaintiff's Administrative Hearing.**

On March 16, 2009, an administrative hearing was conducted to examine Plaintiff's claims. Tr. 9-50. At the hearing, he was represented by Dennis Neitsch, a non-attorney representative employed by a law firm. Tr. 9. Plaintiff and Judith Harper, a vocational expert, testified. Tr. 9-50.

17

The hearing began with an opening statement by Mr. Neitsch, during which he emphasized the lingering effects of the prisoner assault. Tr. 12-13. Plaintiff testified next, noting that he lived with his wife and two children, who were eighteen and eleven years old. Tr. 15. At the time of the hearing, he lived with his younger child, while his wife lived with the elder because her job required her to reside in a different town. Tr. 23. Plaintiff testified that he had done some college work, but not enough to receive an associates degree. Tr. 14. He said that he drove infrequently. Tr. 14-15. Asked about his use of drugs, alcohol, or tobacco, Plaintiff denied consuming any of them. Tr. 16.

When the questioning turned to Plaintiff's employment history, he noted that he worked in various positions for correctional facilities from 1995 to 2001, beginning as a "parent" at "wilderness camps" for juvenile offenders and later performing more traditional guard duties, as well as serving as a prison carpenter. Tr. 33-38. While working for the Texas state prisons in that capacity, an inmate struck him in the base of his skull with an ax-handle during an escape attempt. Tr. 29. According to an inmate who observed the scene, as recounted by Plaintiff at the hearing, the blow caused him to "flop[] around like a fish" and then lose consciousness. Tr. 29-30. During the course of the attack, his hands were also tied behind his back, and he was stabbed repeatedly in the extremities with a knife. Id.

Plaintiff testified that his most recent employment was as an inspector,

examining apartment complexes for a building company for three months in 2007, a job that involved climbing ladders repeatedly each day.  Tr. 16-17.  In his testimony, he explained that he left the position because his injuries undermined the quality of his performance.  Tr. 17-18.  Addressing the ALJ's incredulity as to why an individual with vertigo considered himself capable of working as a building inspector, he replied, "I'm an eternal optimist."  Tr. 22.  Plaintiff further testified that he had been actively searching for other employment with no success. Tr. 18-19.

The ALJ inquired as to the possibility of Plaintiff exploring a career that did not involve climbing, and he replied that he experienced severe pain in his arms and shoulders whenever he attempted to grab objects.  Tr. 19.  He also noted that he found it difficult to walk due to lower-body pain.  Tr. 20.  Plaintiff claimed that his hearing called for hearing aids, but acknowledged that he did not have any.  Id. Discussing his financial condition, he commented that he had previously received worker's compensation and had cancelled it to pursue an educational program, a decision he regretted.  Tr. 20-21.  He then withdrew from college to take a real estate course, which he used to obtain the building inspector position.  Tr. 22.

Plaintiff suggested that he tried to do household chores with mixed results. Tr. 23-24.  In particular, he testified that he attempted to do laundry, sometimes did grocery shopping, regularly used the microwave, and occasionally helped his son

19

with his homework.  Tr. 24-25.  Plaintiff described his average day as consumed
largely by watching television and reading novels.  Tr. 25.

Mr. Neitsch elicited from Plaintiff this general description of his vertigo: "if
I start working[,] moving around[,] trying to do something[,] I just get sick."  Tr.
29.  The condition, he further related, caused him motion sickness, vomiting
episodes, and lingering discomfort after even routine physical tasks, such as
picking up small flower pots.  Tr. 28.  With respect to his other conditions, Plaintiff
testified that his hands were "useless" and that his pain limited his walking ability
to a block or less.  Tr. 31.

The ALJ asked Plaintiff a series of questions regarding his medical
treatment.  Tr. 26-28.  Answering her questions, he testified that he had taken
Cymbalta[21] but that it caused nausea, and that he was taking Diovan for his blood
pressure and hydrocodone for his pain.  Tr. 26-27.  He indicated that it was
difficult to afford drugs for his conditions.  Tr. 28-29.  Plaintiff noted that his
worker's compensation used to pay for vertigo medication but no longer did.  Tr.
29.

Plaintiff then related the various regimes he had experimented with in order
to mitigate his pain, which he claimed encompassed "everything," including hot

---

[21] "Cymbalta ... is a selective serotonin and norepinephrine reuptake inhibitor" used to
treat depression and anxiety.  See http://www.rxlist.com/cymbalta-drug.htm (last visited April 5,
2011).

and cold water, as well as physical therapy.  Tr. 30-31.  He recalled that a physical

therapist found his muscle knot to be "the hardest ... she [had] ever felt in her life."

Tr. 31.  Plaintiff testified that he had not been working recently with his vocational

reorientation counselor because he "just [had not] had a chance to be around

them."  Tr. 32.

       After Plaintiff stepped down, Ms. Harper took the stand.  Tr. 39.  She

testified that his past relevant work was medium and semi-skilled.  Id.  Ms. Harper

noted that Plaintiff lifted upwards of a hundred pounds during his working career.

Tr. 40.  The ALJ then asked her to imagine

           a person who could lift 20 pounds occasionally intermittently
           throughout the day, 10 pounds frequently.  Could stand and
           walk ... six hours out of eight or sit eight out of eight.  Can
           occasionally climb ramps, stairs, bend, stoop, kneel, crouch,
           crawl.  However, no work at unprotected heights or around
           dangerous moving machinery.  No ladders, ropes and
           scaffolds.  With regard to handling and fingering that could
           be done frequently but not constantly.  And that would be for
           both hands and could occasionally do overhead reach and
           lifting.  Has no limitation in ability to understand, remember
           and carry out simple job instructions.  Or to maintain
           attention and concentration for extended periods, that's more
           than two hours at once.  There's moderate limitation defined
           as being able to function reasonably, satisfactorily overall.
           An ability to maintain pace for extended periods, [i.e., for]
           more than two hours at once.  To interact appropriately with
           the general public [and] with supervisors and to respond
           appropriately to changes in a routine work setting.  I don't
           think he would have any problem dealing with co-workers,
           [or people he was] familiar with....  Ability to function still is
           at the reasonably satisfactorily overall level for

> understanding, remembering and carrying out detailed job
> instructions.  Could any of the past work be done by someone
> with that residual functional capacity?

Tr. 40-41.  Ms. Harper replied in the negative.  Tr. 41.  She did, however, propose

several positions she thought Plaintiff could effectively fill, including gate guard,

security guard, merchant patroller, retail marker, storage facility rental clerk, and

small products assembler.  Tr. 42-44.  For each profession, Ms. Harper provided

the approximate numbers of such jobs available in Texas and nationwide.  Id.  She

acknowledged that security guards were required to bend down and pick up objects

on occasion, but stated that gate guards were rarely forced to do such things.  Tr.

45.

Given the opportunity to examine Ms. Harper, Mr. Neitsch demurred,

choosing instead to simply assert that the dispute hinged on whether Plaintiff met

the listings for vertigo and sustainability, and that those listings were satisfied.  Id.

When Plaintiff's hearing problem was raised, Ms. Harper opined that the problems

would not change his proposed jobs.  Tr. 46.  Questioned by the ALJ on the

subject, Plaintiff noted that he had formerly worn hearing aides that he obtained

through the Texas Department of Assistive and Rehabilitative Services, but that the

department no longer regarded him as employable enough to justify the

expenditure.  Tr. 47-48.  The ALJ noted that Plaintiff had been doing well with

meclizine, and Mr. Neitsch commented that he had not been able to afford to renew

the prescription, adding that his poverty also prevented him from pursuing treatment for hydrops.  Tr. 46-48.  In his final remarks, Mr. Neitsch noted that Dr. Arredondo had diagnosed the residual vertigo prior to the date last insured.  Tr. 48.

## C.    The ALJ's Decision.

On August 4, 2009, the ALJ issued an unfavorable decision for Plaintiff.  Tr. 58-67.  She found that Plaintiff met the insurance requirements of the Social Security Act through December 31, 2005.  Tr. 60.  At step one of the substantive analysis, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity after December 17, 2000, the alleged onset date.  Id.  She then determined that Plaintiff suffered from a number of severe impairments, listing them as bilateral carpal tunnel syndrome, status post release, degenerative disc disease of the lumbar spine, status post cervical spine fusion, chronic hepatitis C, PTSD, depression, and a history of alcohol abuse.  Id.

In justifying the severe impairments determination, the ALJ noted as an aside that Plaintiff's medical records reflected benign hypertension, but she considered the condition "well-controlled with medication."  Tr. 61, 65.  She also observed that he complained of vertigo, but that such complaints did not appear in the medical records.  Id.  The ALJ added that neither the hypertension nor the vertigo had caused documented restrictions and neither could therefore be considered severe impairments.  Id.

23

Turning to step three, the ALJ found that Plaintiff's impairments did not meet the requirements listed by the regulations.  Id.  Defending this conclusion, she wrote with respect to the back and neck pain that "the evidence does not support severity of symptoms or neurological deficit."  Id.  As for his hearing impairment, the ALJ determined that his "clinical records do not indicate vestibular dysfunction or word discrimination deficits that would meet the criteria" listed.  Id.  Concerning his PTSD, she found that Plaintiff suffered mild restriction of activities of daily living, moderate difficulties in maintaining social function, mild limitations in concentration, persistence and pace, but no extended episodes of decompensation.  Id.  Finally, the ALJ determined that Plaintiff's "remote history of alcohol abuse ... is not demonstrated to adversely affect his functioning in any area."  Id.  As a result of these findings, she concluded that Plaintiff's mental impairments did not meet the listed criteria.  Id.

The ALJ next considered Plaintiff's RFC and concluded that he had the general capacity to perform light work.  Tr. 62.  In particular, she characterized him as capable of lifting and carrying twenty pounds occasionally and ten pounds frequently, as well as standing and walking six of eight hours a day, sitting eight hours, and occasionally climbing ramps and stairs.  Tr. 61.  The ALJ also noted that she thought he was able to perform work that included intermittent bending, stooping, kneeling, crouching, and crawling.  Id.  In her estimation, Plaintiff could

24

not climb ladders, ropes, or scaffolds, and was unable to perform consistent handling or fine manipulation work, or work calling for more than occasional overhead lifting or movement of the neck.  Id.

With respect to Plaintiff's mental impairments, the ALJ regarded Plaintiff as suffering "'no' limitation in the ability to understand, remember, and carry out short, simple instructions; maintain attention and concentration for extended periods ... and interact appropriately with co-workers."  Tr. 62.  She further ruled that Plaintiff had "'moderate' limitation in the ability to understand, remember and carry out detailed instructions; interact appropriately with the public; interact appropriately with supervisors; and respond appropriately to changes in a routine work setting."  Id.

Explaining the RFC determination, the ALJ conducted a broad survey of the record.  In terms of Plaintiff's physical ailments, she noted that his hepatitis C was likely caused by his former alcoholism, and was presently controlled with therapy, relying chiefly on Dr. Franklin's diagnosis.  Tr. 63-64.

The ALJ recounted Plaintiff's experience during the prison escape, and reviewed the various medical reports produced afterwards, which included treatment for head pain.  Tr. 64.  She observed that Plaintiff had been diagnosed with nonspecific lower back pain and status post carpal tunnel release with no residuals.  Id.  The ALJ further observed that Plaintiff had been taking three

Vicodin tablets a day, despite a doctor's conclusion that the dosage was unwarranted.  Id.  She noted that doctors concluded his elbows and wrists no longer called for "further attention."  Id.  The ALJ described Dr. Franklin's findings at length, interpreting his report to indicate full range of motion in his back despite mild degeneration in the spine, carpal tunnel syndrome, ulnar tunnel syndrome, sixty percent hand strength, eighty percent strength in all extremities, and some diminution in fine manipulation skills.  Id.  She also recited more recent medical evidence, which included evidence that he had chronic pain syndrome and lower back pain.  Tr. 65.

Additionally, the ALJ described treatment Plaintiff received for vertigo, disequilibrium, and hearing loss after the prison escape.  Tr. 63.  She ruled, however, that his hearing impairment did not significantly limit his word discrimination ability, emphasizing a June 17, 2008 examination that analyzed his word discrimination capacity and a September 12, 2007 ear examination that found no problems.  Id.

The ALJ likewise surveyed the evidence concerning Plaintiff's neurological condition.  Tr. 63-65.  Specifically, she described an evaluation as yielding the conclusion that Plaintiff had "no muscle atrophy, and normal reflexes and sensory responses."  Tr. 64.  She commented that two examinations found no neurological or cognitive deficiencies.  Tr. 63-64.

26

The ALJ also conducted a lengthy review of the record regarding Plaintiff's alleged mental impairments.  During the review, she observed as a general matter that he had not required extensive treatment for mental impairments or PTSD.  Tr. 63.  The ALJ noted that he took Cymbalta for depression and had been prescribed Effexor as well, but opined that there was "no evidence of severe ongoing symptoms that would preclude gainful employment."  Tr. 63, 64.  She recounted a mental status examination that disclosed "clear sensorium, average cognition, fair judgment and insight, and some hypervigilance."  Tr. 64.  The ALJ took notice that Plaintiff had been found to suffer from PTSD and major depressive disorder, and had received GAF scores of fifty-eight and sixty.  Id.  She quoted a physical examination conducted on September 12, 2007, which found no mental health issues.  Id.  Concluding her review of the record pertaining to Plaintiff's mental impairments, the ALJ recited the most recent medical evidence, which included a determination that he had depression and had been medicated for it.  Tr. 65.

Commenting on Plaintiff's general work capacity, the ALJ noted that Plaintiff took care of his eleven-year-old son, cooked, cleaned, drove, and managed the household in his wife's absence, including the family's finances.  Tr. 63, 64.  She emphasized that a functional capacity evaluation found that he could perform medium range work, which entailed lifting forty-pound objects.  Tr. 63.  The ALJ also highlighted Dr. Arredondo's opinion that Plaintiff could not return to his past

27

work, but was capable of alternative medium work.  Tr. 64.

Turning to Plaintiff's credibility, the ALJ postulated that his "medically determinable impairments could reasonable be expected to cause some of the alleged symptoms" but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC determination.  Tr. 63.  By contrast, she put greater stock in the conclusions of the state agency medical physicians and other consultants–who she termed non-examining expert sources–as well as the views of Ms. Harper.  Tr. 65.  The ALJ observed that the former found Plaintiff able to perform light range work on September 23, 2008 and concluded that subsequent medical evidence did not disturb that finding.  Id.  She relied upon the latter to support her view that Plaintiff was unable to perform his past relevant work as a carpenter or correctional officer, but that he could transition to other professions represented in the economy in significant numbers.  Tr. 65-66.  As an aside, she remarked that the transferability of his job skills was irrelevant because he was not disabled.  Tr. 66.

In light of these numerous findings, the ALJ ruled that Plaintiff had not suffered from a disability during the relevant period and therefore denied him disability insurance benefits and supplemental social security income.  Tr. 67.

28

### III.  LEGAL STANDARDS

**A.      Social Security Act Disability Benefits Requirements.**

The same law and regulations govern whether an individual is considered disabled and therefore entitled to benefits under either the disability insurance benefits or the supplemental security income benefits provisions of the Social Security Act.  Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989) (per curiam) (citations omitted).  Specifically, the Social Security Act establishes that every individual who is insured for disability insurance benefits, has not attained the set retirement age, has filed an application for disability benefits, and is under a disability is entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that a claimant is not disabled if that person can perform jobs available in the national economy:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific

> job vacancy exists for him, or whether he would be hired
> if he applied for work.  For purposes of the preceding
> sentence ... "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

**B.      Social Security Administration Regulations And Rulings.**

To determine if an individual suffers from a disability, as defined by the

Social Security Act, the Commissioner has promulgated regulations containing a

five-step sequential process to be used by the Social Security Administration.  20

C.F.R. §§ 404.1520, 416.920.  A disability finding at any point in the five-step

sequential process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d

1019, 1022 (5th Cir. 1990) (citation omitted).

A claimant bears the burden of proof on the first four steps.  Bowling v.

Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citation omitted).  The

claimant must prove that: (1) he is not presently engaged in substantial gainful

activity; (2) he suffers from an impairment or impairments that are severe; and that

either (3) the impairment meets or equals an impairment listed in the appendix to

the regulations; or (4) due to the claimant's RFC, the impairment prevents the

claimant from doing any past relevant work.  20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold

determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000) (citations omitted). The Commissioner may find that a claimant's impairment fails to meet the significant limitation requirement of step two "only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Id. at 391 (citation omitted).

Step three requires a claimant to prove that any of his impairments meet one or more of the impairments listed in the regulations, which include both physical and mental impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria for determining the severity of the listed mental impairments include whether there is marked interference with activities of daily living, social functioning, concentration, persistence, or pace, and repeated episodes of decompensation. Id. at Pt. A § 12.00(C). The regulation defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Id. at Pt. A § 12.00(C)(4). The claimant must present

31

evidence that the impairment is a long-term problem rather than a temporary set-back, but "does not have to show a 12 month period of impairment unmarred by any symptom-free interval." Singletary v. Bowen, 798 F.2d 818, 821 (5th Cir. 1986) (citations omitted).

Pursuant to the fourth step, a claimant who is unable to show that his impairment meets one of the listed impairments must show that he is unable to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant's RFC is taken into consideration to determine whether his impairments may cause physical and mental limitations that affect his ability to work. 20 C.F.R. §§ 404.1545, 416.945. The RFC is the most a claimant can do despite any limitations caused by an impairment. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). All relevant evidence in the record, including medical and non-medical evidence, is taken into consideration by the Commissioner when making a determination of a claimant's RFC. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The Commissioner must consider all of a claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and non-medical evidence in the record. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996). "[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the

symptoms limit the individual's ability to do basic work activities." Id. at *2.
When a claimant's statements concerning symptoms and their associated
limitations "are not substantiated by objective medical evidence, the adjudicator
must make a finding on the credibility of the individual's statements based on a
consideration of the entire case record." Id.

The adjudicator's discussion of a claimant's RFC must thoroughly discuss
and analyze the objective medical and other evidence in relation to the symptoms.
SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996).  This discussion must
include a resolution of any inconsistencies in the record, address a logical
explanation of effects of the alleged symptoms on the individual's ability to work,
contain a determination of why symptom-related functional limitations can or
cannot be reasonably accepted as consistent with medical or non-medical evidence,
and address any medical opinions contained in the record.  Id.

If the claimant is able to meet his burden under the first four elements, the
burden shifts to the Commissioner for the fifth.  Bowling, 36 F.3d at 435.  The fifth
step requires the Commissioner to determine, based on the claimant's RFC, age,
education, and work experience, if the claimant can make an adjustment to other
work that exists in significant numbers in the national economy.  20 C.F.R.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot make an adjustment
to other work, the claimant is disabled.  Id.

33

## C.    Judicial Review Of The ALJ's Decision.

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  See Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); accord Carey, 230 F.3d at 135.  The Fifth Circuit has described this burden as more than a scintilla, but less than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995) (citations omitted).  A finding of "no substantial evidence" occurs "only where there is a conspicuous absence of credible choices or no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam) (citation omitted).

If the Commissioner's findings are supported by substantial evidence, the Court must defer to the Commissioner and affirm the findings.  See Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002) (citation omitted).  In applying the substantial evidence standard, courts scrutinize the record to determine whether such evidence is present.  They do not, however, re-weigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner.  Id.;

<u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).  Factual conflicts that exist in the record are for the Commissioner and not the Court to resolve.  <u>Masterson</u>, 309 F.3d at 272.  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: "(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history."  <u>Wren v. Sullivan</u>, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

## IV.  <u>ANALYSIS</u>

Defendant argues that summary judgment should be granted in his favor because the ALJ's final decision that Plaintiff was not disabled was supported by substantial evidence and because she followed the correct legal standards in reaching her decision.  (D.E. 8).  Plaintiff seeks a remand on the grounds that the ALJ relied upon Ms. Harper's answer to a flawed hypothetical question, that the work the ALJ found suitable for him was inconsistent with the RFC determination, and that the ALJ erred in her calculation of Plaintiff's mental RFC.  (D.E. 11).

**A.    The ALJ Erred In Omitting Vertigo From The List Of Plaintiff's Severe Impairments.**

The ALJ excluded vertigo from her list of Plaintiff's severe impairments because "the medical records [did] not document any persistent complaints of dizziness of vertigo," because there were "no documented restrictions due to ...

35

dizziness," and because the impairment was, in her eyes, "not severe within the meaning of the regulations and under" controlling Fifth Circuit precedent.  Tr. 61 (citing Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985)).  As a factual matter, the ALJ was flatly mistaken on both of the first two statements, raising serious doubts as to the accuracy and legal propriety of the third.

Contrary to the ALJ's assertions, there are in fact numerous indications in the record that Plaintiff complained repeatedly about vertigo, and that his complaints were found credible by several doctors.  Over the course of more than six years, beginning in 2002, no fewer than four doctors diagnosed him with the condition.  Tr. 201, 221 (two diagnoses by Dr. Syms), 252 (Dr. Henderson), 347-48 (Dr. Arredondo), 486 (Dr. Rowley).  These doctors clearly took Plaintiff's complaints of vertigo seriously, as two suggested that he take medication.  Tr. 221-22 (Dr. Syms prescribing Phenergan and noting that he took meclizine), 252 (Dr. Henderson advising that he take vertigo medication).  It is difficult to imagine what persistent complaints–not to mention legitimate persistent complaints–look like, if not this.  See Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992) (emphasizing absence of "definite diagnosis" and lack of recommended treatment in upholding ALJ's finding of no severe impairments).

Perhaps more importantly, the ALJ's belief that Plaintiff faced "no

documented restrictions" as a result of his vertigo was equally groundless.  On the contrary, Dr. Henderson wrote in 2003 that he should "avoid any work that puts him in a situation with possible bodily injury due to his disequilibrium."  Tr. 252-53.  Similarly, Dr. Rowley recommended in 2008 that Plaintiff keep away from unprotected heights and moving machinery because of his vertigo.  Tr. 486.  These are manifestly "documented restrictions due to" vertigo and the ALJ's conclusion to the contrary is therefore plainly mistaken.

It is equally clear that the ALJ's error in overlooking this abundant documentary evidence substantiating Plaintiff's vertigo doomed the validity of her decision to exclude it as a severe impairment.  In Stone, relied upon by the ALJ, the Fifth Circuit declared that "'[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'"  752 F.2d at 1102 (citations omitted).  The medical evidence reviewed above, by its express terms, creates such an expectation.  At the very least, the ALJ had a duty to show good cause for rejecting the four medical opinions documenting vertigo, and an obligation not to arbitrarily ignore the uncontroverted medical evidence these diagnoses represented.  20 C.F.R. § 404.1527(d); Loza, 219 F.3d at 395 (citations omitted); Goodley v. Harris, 608 F.2d 234, 236-37 (5th Cir. 1979) (citation

omitted).  She failed on both counts.

Indeed, the existence of the error is confirmed by the conditions the ALJ <u>did</u> list as severe impairments, as they include health problems that find far less corroboration from the medical record than does his vertigo.  In particular, she characterized Plaintiff's hepatitis and alcoholism as severe impairments, despite the apparent absence of any medical opinion that restricted his working capacity on either ground, and indeed the absence of any medical or psychological discussion of his alcoholism in the record whatsoever.

Accordingly, it is respectfully recommended that the ALJ erred in excluding vertigo as a severe impairment.

**B.      The ALJ's Assessment Of Plaintiff's RFC Was Not Substantially Supported By The Record.**

Plaintiff argues that the ALJ erred in her formulation of his RFC because she improperly defined "moderate limitations," and because she omitted mental and social limitations established by the record.  (D.E. 11, at 9-10).   Defendant contends that the ALJ's RFC assessment was substantially supported by the record. (D.E. 8, at 5).

**1.      The ALJ did not err in defining moderate limitations.**

Plaintiff asserts that the ALJ's definition of moderate limitations was fatally flawed on account of its circularity.  (D.E. 11, at 9).  To describe a moderate

limitation as the ability to "function reasonably, satisfactorily overall," as the ALJ

did, is, in Plaintiff's opinion, to guarantee a finding of no disability a priori. Id.;

Tr. 41.  Defendant does not address this argument, electing instead to flatly assert

that there was no definitional error while focusing the bulk of his response on

establishing the fundamental soundness of the ALJ's RFC assessment, and that of

the hypothetical question and answer.  (D.E. 12).

The only authority cited by Plaintiff for the proposition that the ALJ

mistakenly defined moderate limitations is common sense.  If he had consulted

more traditional sources of legal authority, he would have discovered that the Fifth

Circuit has addressed–and rejected–a nearly identical argument.  In Cantrell v.

McMahon, 227 F. App'x 321 (5th Cir. 2007) (per curiam) (unpublished), the

plaintiff challenged an ALJ's decision to define moderate limitations "as meaning

'there are some moderate limitations, but the person can still perform the task

satisfactorily.'"  Id. at 322.  The Fifth Circuit upheld the ALJ's definition, finding

that it adequately reflected the term as described in the Social Security regulations.

Id.

Neither the Cantrell definition nor the one at issue here are models of clarity,

and it is perhaps understandable that Plaintiff attacks the latter.  Nevertheless, the

Fifth Circuit's repudiation of his theory is plainly based on the fact that the term

"moderate" essentially speaks for itself given its commonplace meaning, and therefore does not require any real elaboration or clarification.  Indeed, this is especially the case in light of the fact that vocational experts are well-versed in applying the Social Security Administration's regulations and consequently do not require tutorials on their terminology.  See Travis v. Astrue, No. 09-cv-077, 2009 WL 3422770, at *11 (W.D. Wis. Oct. 22, 2009) (unpublished) ("drawing conclusions about the skill level of work that can be performed by a person with certain ... limitations is precisely what vocational experts are trained to do").  In other words, Plaintiff may well be right that the ALJ's definition was circular, but this constitutes no error because a self-evident term expressed to the very official entrusted with its application does not require an illuminating definition.

Accordingly, it is respectfully recommended that the ALJ's definition of moderate limitations did not constitute error and that summary judgment be granted to Defendant on this claim.

### 2.      The ALJ erred in calculating Plaintiff's mental RFC.

Plaintiff submits that the ALJ erred in her determination of Plaintiff's mental RFC.  (D.E. 11, at 9).  He is correct.  With respect to Plaintiff's mental health, the ALJ found "no evidence of severe ongoing symptoms that would preclude gainful employment."  Tr. 63, 64.  In so finding, she apparently overlooked Dr. McMan's

conclusion that Plaintiff was psychologically incapable of returning to work because of the vicious attack he sustained at the hands of escaping prisoners, as well as Dr. Clark's view that he was likely unable to maintain gainful employment as a result of his psychological problems  Tr. 268, 457.

Social Security regulations require that the ALJ show good cause for rejecting a medical opinion.  20 C.F.R. § 404.1527(d); Loza, 219 F.3d at 395 (citations omitted).  An ALJ may not arbitrarily ignore uncontroverted medical evidence.  Goodley, 608 F.2d at 236-37 (citation omitted).  The Fifth Circuit has explained that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original), overruled in part on other grounds by implication in Sims v. Apfel, 530 U.S. 103 (2000).  These criteria include:

> (1) the physician's length of treatment of the claimant;
>
> (2) the physician's frequency of examination;
>
> (3) the nature and extent of the treatment relationship;
>
> (4) the support of the physician's opinion afforded by the medical evidence of record;

41

> (5) the consistency of the opinion with the record as a whole; and
>
> (6) the specialization of the treating physician.

Id. at 456 (citing 20 C.F.R. § 404.1527(d)(2)).  Even when a treating physician's opinion does not meet the test for controlling weight, it is still entitled to deference.  Id. (citation omitted).  In rejecting the opinion of a treating physician, or affording it little weight, an ALJ must consider each and every one of these six criteria.  Id. (citations omitted).  Failure to do so warrants remand of the case so that the analysis may be conducted.  See id.

In implicitly dismissing the views of Dr. McMan and Dr. Clark, who both have doctorates in psychology, the ALJ did not even begin to conduct this analysis.  Her remark that there is "no evidence" of a disabling mental impairment strongly suggests that she neglected to review their diagnoses at all, and consequently failed to accord them any deference or even tacitly consider any of the criteria outlined in Newton.  See 209 F.3d at 456.

Accordingly, it is respectfully recommended that the ALJ erred in calculating Plaintiff's mental RFC.

**C.      The ALJ Did Not Make A Reasonable Determination Of Plaintiff's Credibility.**

In weighing Plaintiff's entitlement to benefits, the ALJ discounted his credibility to the extent that his statements contradicted the RFC assessment.  Tr. 63.  Defendant insists that Plaintiff's credibility was properly assessed, emphasizing the various activities that he conceded he could perform and the ALJ's discretion in judging credibility.  (D.E. 8, at 6-7).

Social Security Ruling 96-7P describes how the Commissioner is to evaluate subjective symptoms and to determine the credibility of an individual's statements. See SSR 96-7P, 1996 WL 374186; see also Beck v. Barnhart, 205 F. App'x 207, 212-13 (5th Cir. 2006) (per curiam) (unpublished) (evaluating ALJ's decision according to SSR 96-7p).  According to Ruling 96-7P, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  SSR 96-7P, 1996 WL 374186, at *1.  The ALJ must next evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic work activities.  Id.  If the individual's statements regarding the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ determines credibility by

43

considering the record as a whole, including medical signs and laboratory findings; the individual's own statements about the symptoms; any statements or other information provided by treating or examining physicians, psychologists, or other persons about the symptoms and how they affect the individual; and any other relevant evidence.  Id.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, Ruling 96-7P addresses seven factors, outlined in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c), which the ALJ should consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for fifteen to twenty minutes every hour, or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7P, 1996 WL 374186, at *3.

44

Finally, Ruling 96-7P addresses the standard for making credibility determinations. Id. at *4.  An ALJ's credibility determination cannot be based on an intangible or intuitive notion about an individual.  Id.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  Id.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  Id.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight.  Id.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.  Id.

If an applicant's physician has prescribed treatment that can restore his ability to work, he must undergo the treatment in order to get benefits.  20 C.F.R. § 404.1530(a).  If he does not comply, he will not be found disabled.  20 C.F.R. § 404.1530(b).  Several circuits require an ALJ to make a finding that the treatment would restore the applicant's ability to work before denying benefits under this section.  See, e.g., Patterson v. Bowen, 799 F.2d 1455, 1460 (11th Cir. 1986)

(collecting cases); accord Quintanilla v. Astrue, 619 F. Supp. 2d 306, 321 (S.D. Tex. 2008).

As a preliminary matter, Defendant's argument that "Plaintiff's intention to return to work tends to prove that he was able to work" must be dismissed out of hand.  (D.E. 8, at 7).  The case he cites for this proposition, Naber v. Shalala, 22 F.3d 186 (8th Cir. 1994), says no such thing.  Rather, the Eighth Circuit there held that a plaintiff who expressed a desire at his administrative hearing to "work on his brother's ranch or in a woodshop or paint shop" thereby betrayed a lack of disabling pain.  Id. at 188.  The Eighth Circuit's ruling rests on the intuitive assumption that an individual who articulates specific, concrete plans to do a particular kind of work is likely an individual capable of performing that work.  By contrast, the statement Defendant holds against Plaintiff is his comment "that he looked for 'any work he could find.'" (D.E. 8, at 7).  Essentially, then, Defendant seeks to punish him for the mere desire to find gainful employment.  He has brought forward no decisions adopting such a principle.  Given its obvious potential to encourage malingering and deceit in Social Security proceedings, it is exceedingly unlikely that any exist.  Indeed, even the Eighth Circuit has implicitly renounced such a broad reading of Naber.  See Bergmann v. Apfel, 207 F.3d 1065, 1070-71 (8th Cir. 2000) (finding plaintiff entitled to benefits despite her intention

46

to return to work).

The ALJ's reasons for discounting Plaintiff's credibility are unclear because she failed to defend her credibility assessment.  Instead, she simply asserted that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC determination.  Tr. 63.  This alone could be regarded as an error on her part.  SSR 96-7P, 1996 WL 374186, at *4 (adverse credibility finding must involve more than a conclusory statement that an individual is not credible).

Nevertheless, the ALJ's potential reasons for dismissing Plaintiff's credibility can be inferred from the rest of her opinion, including its description of the various pieces of medical evidence that she did credit.  Of particular interest is her comment that Plaintiff's mental impairments never required extensive treatment.  Tr. 63.  That comment suggests that the ALJ lost faith in his credibility in part because she believed he failed to seek counseling or other care with sufficient diligence.  Although a lack of such diligence can factor into a credibility determination, 20 C.F.R. § 404.1530(a), it cannot form the basis for a dismissal of Plaintiff's subjective complaints here.

First, and most obviously, the ALJ made a highly questionable judgment about what constitutes sufficiently extensive treatment such that a plaintiff's failure

to pursue it would damage his credibility.  The sheer numbers here do not suggest

an individual reluctant to treat his psychological problems.  Plaintiff's mental state

was evaluated by thirteen people, including eleven doctors, at least four of whom

had doctorates in psychology.  Although it is unclear who prescribed him each

medication, he took at least three drugs for his mental and emotional conditions.

Tr. 26 (Cymbalta), 225 (Paxil), 298 (Effexor).  Given this wealth of evidence

indicating that Plaintiff received a substantial amount of treatment for his

psychological problems, the ALJ was at the very least obligated to explain where

in the record she discerned a lack of diligence.  See Charles v. Astrue, 291 F.

App'x 552, 555 (5th Cir. 2008) (per curiam) (unpublished) (suggesting that ALJ

must sufficiently explain evidence upon which adverse credibility assessment is

based).

     Such an explanation is especially warranted because Plaintiff suggested that

he may not have obtained medical care for his ailments in part due to insufficient

funds.  Tr. 28-29.  When a plaintiff "cannot afford the prescribed treatment or

medicine, and can find no way to obtain it, '[a] condition that [was] disabling in

fact continues to be disabling in law.'"  Lovelace v. Bowen, 813 F.2d 55, 59 (5th

Cir. 1987) (citation omitted).  The Lovelace rule only applies where a plaintiff is

disabled in the absence of treatment, Harper v. Sullivan, 887 F.2d 92, 97 (5th Cir.

48

1989), and where there is some indication that medications were prescribed but became prohibitively expensive.  See Fellows v. Apfel, No. 98-40337, 2000 WL 309976, at *3 (5th Cir. Mar. 8, 2000) (per curiam) (unpublished).

In Plaintiff's case, there was at least some evidence that both conditions were met.  See, e.g., Tr. 28-29 (Plaintiff testifying that he wanted to continue taking medication but could not afford to); Tr. 46-48 (Plaintiff's representative noting same); Tr. 265 (Dr. McMan determining that Plaintiff's PTSD prevented him from rejoining the workforce).  As a result, it was unreasonable of the ALJ to simply assume that any lack of treatment for Plaintiff's mental conditions suggested that he could not testify credibly about his complaints.  At the very least, she owed a clear duty to develop the record on this issue before resolving it against Plaintiff.  Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995) (an ALJ owes "a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits.  If the ALJ does not satisfy [her] duty, [her] decision is not substantially justified.)" (citations omitted).

Accordingly, it is respectfully recommended that the ALJ made an unreasonable determination of Plaintiff's credibility.

49

**D.     The ALJ Improperly Relied Upon The Vocational Expert's Answer To The Hypothetical.**

Defendant maintains that the hypothetical question submitted to Ms. Harper was properly formulated and appropriately relied upon by the ALJ.  (D.E. 8, at 7). Plaintiff contends that the hypothetical question was improper because it deviated from the ALJ's formal RFC determination.  (D.E. 11, at 3).  In particular, he stresses that the two formulations diverged on the restrictions Plaintiff endured in handling or fine manipulation work and neck movement.  (D.E. 11, at 3).  He submits that this failure is especially significant given the nature of the jobs cited by Ms. Harper, because those jobs entail frequent neck movement and use of the hands.  Id. at 4-6.  Defendant responds "that the ALJ's hypothetical reasonably incorporated all of the disabilities recognized by the ALJ," noting that her formal findings and question both reflected some limitations in fingering and handling skills.  (D.E. 12, at 2).

Because Defendant concedes that the ALJ erred when she neglected to limit the hypothetical worker to occasional overhead lifting or movement of the neck, (D.E. 12, at 2), the only question that remains with respect to that error is whether or not it was harmless, a question considered below.

The parties do dispute whether the discrepancy concerning hand limitations constituted an error.  In the ALJ's RFC assessment, she concluded that Plaintiff

"cannot perform consistent handling or fine manipulation work."  Tr. 62.  In her

hypothetical question, however, she depicted an individual who could perform

tasks involving handling and fingering "frequently but not constantly."  Tr. 41.

Plaintiff maintains that the incongruities in the ALJ's two formulations "render[s]

her decision unsupported by substantial evidence."  (D.E. 11, at 3).  Defendant

disagrees, insisting that these two descriptions "clearly mean the same thing: that

although Plaintiff can frequently (or 2/3 of the time) perform fingering and

handling, he cannot do it all of the time."  (D.E. 12, at 2).

     In Defendant's view, the debate boils down to whether the words

"constantly" and "consistently" are substantively different.  (D.E. 12, at 2).  Even if

this were the case, he would likely lose the argument.  See Quinlisk v. Astrue, No.

08-cv-2694, 2010 WL 148279, at *4 n.6 (D. Colo. Jan. 7, 2010) (unpublished)

(noting that confusion of "constant" with "consistent" in elaboration of plaintiff's

limitations could be a potentially material difference, and thus implying that it

could be an error).

     In any event, however, Defendant's neat oppositional does not capture the

true discrepancy here.  Although "consistent" and "constant" are certainly similar

terms in a vacuum, there is far less overlap between them in the instant context:

"cannot perform consistent handling" and "[can perform handling] frequently but

not constantly."  Tr. 41, 62.  The addition of "frequently" significantly alters the analysis because it places "constantly" in a far different light.  Indeed, the use of such a modifier seems almost precisely designed to <u>distance</u> "constant" from "consistent."  <u>See</u> <u>United States v. Stevens</u>, 559 U.S. __, 130 S. Ct. 1577, 1588 (2010) ("an ambiguous term may be 'given more precise content by the neighboring words with which it is associated.'") (citation omitted).  To say that the Plaintiff can perform an act frequently but not constantly is to say that he can perform it most of the time, just not all of the time, which is of course a very different thing than to say flatly that he cannot do it consistently.

Putting the point in a slightly different manner, instead of asking whether and how "consistent" and "constant" diverge, one could just as reasonably ask whether "frequently" and "not consistently" do, and the answer to that is plainly affirmative.  <u>Compare</u> SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983) (defining "frequent" as occurring from one-third to two-thirds of the time) <u>with</u> Merriam-Webster's Collegiate Dictionary 247 (10th ed. 1996) (defining "consistent" as "marked by ... regularity, or steady continuity").  As these definitions make clear, there may still be some overlap between the two formulations, but there is certainly also an area of no overlap, an area in which one can perform an act "consistently" while falling short of "frequent but not constant" performance.  Because the

52

hypothetical question veered from the RFC, there is a distinct likelihood that the question was based in part on an assessment the ALJ never made.  See Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988) (per curiam) (hypothetical question must reasonably incorporate disabilities recognized by ALJ).  Accordingly, it is respectfully recommended that the question was in error, and that the ALJ improperly relied upon the answer.

**E.      The ALJ's Errors Were Not Harmless.**

The Fifth Circuit has determined that district courts reviewing denials must apply a harmless error analysis.  Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.") (citation omitted).  The Audler court further explained that "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'"  Id. (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).

The ALJ's mistaken omission of vertigo from the list of Plaintiff's severe impairments cannot be considered harmless because she included in his RFC capabilities that may well lie beyond his abilities on account of his condition. Although the ALJ excluded climbing ladders, ropes, or scaffolds (an apparent

acknowledgment of his vertigo that makes her earlier conclusion that he had no

such severe impairment even more mystifying), she did regard him as capable of

climbing ramps and stairs.  Tr. 61-62.

It is possible that Plaintiff's vertigo does not limit his ability to climb ramps

or stairs.  See Kowaluk v. Comm'r of Soc. Sec., No. 08-005, 2009 WL 775470, at

*6, 12 (W.D. Pa. Mar. 18, 2009) (unpublished) (upholding a hypothetical question

that allowed individual with vertigo to climb ramps and stairs).  On the other hand,

it is possible that it does, especially considering Dr. Henderson's advice that

Plaintiff "avoid any work that puts him in a situation with possible bodily injury

due to his disequilibrium," Tr. 252-53, as well as Dr. Arredondo's recommendation

that Plaintiff avoid any heights or climbing.  Tr. 332.

Similarly, it is possible that some of the positions listed by Ms. Harper

would not entail climbing ramps or stairs, but there is no evidence in the record to

support such a conclusion.  In any event, the determination of whether Plaintiff's

vertigo should have altered the RFC and hypothetical question, and whether that

alteration changes the scope of employment he is capable of pursuing, is a question

for an ALJ in consultation with a vocational expert.  See Carey, 230 F.3d at 135

(judicial review of ALJ decisions limited to whether substantial evidence supports

decision and whether proper legal standards were brought to bear).

The harmless error analysis of the ALJ's failure to properly assess Plaintiff's mental RFC is far simpler. Had the ALJ credited Dr. McMan's professional opinion that he was incapable of working due to his psychological trauma (or Dr. Clark's that this was likely the case), he would perforce have found Plaintiff disabled. An analysis of those opinions pursuant to the proper criteria is consequently necessary.[22]

Similarly, it cannot be assumed that the ALJ's failures with respect to her credibility assessment of Plaintiff were harmless. If the ALJ found, after conducting that analysis properly, that Plaintiff was credible, she presumably would have found him disabled given the severity of his complaints. See, e.g., Tr. 28-31 (Plaintiff testifying that his vertigo caused intense suffering after even slight movement, that he could not use his hands, and that his pain substantially impinged upon his ability to walk). This is especially likely given the importance of the credibility assessment, the array of medical reports substantiating many of Plaintiff's complaints, and the other errors committed by the ALJ. See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam) (finding potential

---

[22] Indeed, although detailed fact-finding regarding potential jobs is the province of the ALJ in consultation with the vocational expert, it is notably surprising that the ALJ here found security guard and merchant patroller to be attractive vocations for Plaintiff, despite the fact that nine doctors diagnosed him with PTSD as the result of a brutal attack suffered while working as a prison employee.

credibility error harmless where ALJ placed little reliance upon it and overwhelming reliance on medical reports contradicting disability claims).

Lastly, the harmlessness analysis with respect to the hypothetical question reaches the same result.  Indeed, Defendant's accusation that Plaintiff's discussion of his eligibility to perform the jobs proposed by Ms. Harper is "mere speculation" reenforces the necessity of a remand.  The parties' debate on this question is in fact largely conjectural on both sides, as it imagines what Ms. Harper would have said if the hypothetical had incorporated the neck limitations and provided a more precise account of the hand limitations, and then imagining what the ALJ would have done with that response.  This is not the proper forum for conducting that inquiry.  See Masterson, 309 F.3d at 272 (courts should not re-weigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner); Bowling, 36 F.3d at 436 ("a determination of non-disability based on ... a defective question cannot stand") (citation omitted).

Accordingly, it is respectfully recommended that the ALJ's errors were not harmless and that a remand is therefore necessary.

## V.  RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that Plaintiff's cross-motion for summary judgment, (D.E. 11), be granted with respect to the

ALJ's omission of vertigo from the list of Plaintiff's severe impairments, with respect to the calculation of Plaintiff's mental RFC, with respect to her assessment of Plaintiff's credibility, and with respect to her formulation of the hypothetical question.  It is further respectfully recommended that his motion be denied with respect to his challenge to the ALJ's definition of moderate limitations.  It is also respectfully recommended that Defendant's motion for summary judgment, (D.E. 7, 8), be granted with respect to his claim that moderate limitations were properly defined and denied in all other respects.  Finally, it is respectfully recommended that this matter be remanded for further proceedings consistent with this memorandum and recommendation.

Respectfully submitted this 21st day of April 2011.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

58